| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock St. Denver CO 80202 | DATE FILED: February 16, 2023 12:20 PM<br>FILING ID: 97611B3D11382<br>CASE NUMBER: 2023CV30527 |
| Plaintiff:    **MARY DOUGHERTY**<br><br>v.<br><br>Defendant:    **AUTO-OWNERS INSURANCE<br>COMPANY** | |
| | ▲COURT USE ONLY▲ |
| Attorneys for Plaintiff:<br>Todd Scardina, Esq., #40333<br>Autumn Scardina, #39491<br>Scardina Law, LLC<br>501 S. Cherry St., Suite 1100<br>Denver, CO 80246<br>Phone: 720-420-9068<br>Facsimile: 303-845-5594<br>E-mail: todd@scardinalaw.com<br>       autumn@scardinalaw.com | Case No.:<br><br>Ctrm/Div: |
| **COMPLAINT AND JURY DEMAND** | |

      **COMES NOW**, Plaintiff Mary Dougherty, by and through her counsel, and submits her Complaint and Jury Demand against Defendant Auto-Owners Insurance Company and as support for the same, states, alleges, and avers as follows:

## INTRODUCTION

      1.    Plaintiff, Mary Dougherty, (hereinafter "**Plaintiff**") seeks damages arising from the breach of contract, bad faith breach of contract, and violation of C.R.S. § 10-3-1115, 1116, and 1104 by her insurance company, Defendant Auto-Owners Insurance Company (hereinafter "**Defendant**")

## PERSONAL JURISDICTION

      2.    Pursuant to C.R.S. § 13-1-124(a) & (d), this Court has personal jurisdiction over the parties to this action as Defendant transacted business within the State of Colorado by contracting to insure Plaintiff, who is a resident of the State of Colorado.

## SUBJECT MATTER JURISDICTION

3.      This Court has subject matter jurisdiction pursuant to Article VI, Section 9 of the Colorado Constitution.

## VENUE

4.      Venue is proper pursuant to C.R.C.P. 98(c) as the Defendant is a foreign corporation and the Denver is the county designated in the complaint.

## FACTUAL ALLEGATIONS

### Domiciles

5.      At all times relevant, Plaintiff resided at 8419 West 95th Drive in Westminster, Colorado (the "**Residence**").

6.      Defendant is a foreign insurance company authorized to write homeowners/general property insurance in the State of Colorado.

7.      Upon information and belief, Defendant's primary address is 6101 Anacapri Boulevard, Lansing, MI 48917-3968.

### The Policy

8.      Prior to February 16, 2021 (the "**Date of Loss**"), Defendant entered into a contract for homeowners insurance coverage coverage with Plaintiff with a policy number 51-517351-01 (hereinafter the "**Policy**").

9.      The Policy is incorporated herein by this reference.

10.     The Policy was in full force and effect at all times material to this matter.

11.     The Policy provides for the following coverages for Plaintiff's Residence:

|   |   |   |
|---|---|---|
| A. | Dwelling | $ 309,500.00 |
|    | Adjusted Value Factor: | 1.034 |
| B. | Other Structures | $ 30,950.00 |
| C. | Personal Property | $ 216,650.00 |
| D. | Additional Living Expense and Loss of Rents | |
| E. | Personal Liability (each occurrence) | $ 300,000.00 |
| F. | Medical Payments (each person) | $ 5,000.00 |
| G. | Guaranteed Home Replacement Cost | |

12.     Plaintiff's premium for the Policy was paid in full at all times material to this matter.

13.     The Policy was procured from Risk Management Partners.

14.     The Policy was issued on Defendant's "Homeowners Policy Form 3."

<u>The Loss</u>

15.     On or about the Date of Loss, domestic water lines located in Plaintiff's Residence froze and subsequently ruptured and caused damage to the Residence (the "**Loss**").

16.     Temperatures near the Residence were as follows leading up to and following the Date of Loss:

| Date | High | Average | Low |
|------|------|---------|-----|
| February 10, 2021 | 34.2 F | 18.5 F | 11.1 F |
| February 11, 2021 | 25.5 F | 15.6 F | 7.0 F |
| February 12, 2021 | 11.1 F | 5.0 F | 0.1 F |
| February 13, 2021 | 3.4 F | -0.2 F | -4.9 F |
| February 14, 2021 | 7.7 F | -3.6 F | -11.7 F |
| February 15, 2021 | 27.5 F | 5.8 F | -13.0 F |
| February 16, 2021 | 46.8 F | 23.4 F | 1.9 F |
| February 17, 2021 | 30.2 F | 24.3 F | 16.5 F |
| February 18, 2021 | 38.3 F | 22.2 F | 9.5 F |
| February 19, 2021 | 46.0 F | 30.8 F | 7.0 F |

17.     Water first began to flow from the frozen pipes on the Date of Loss.

18.     Plaintiff first became aware of the Loss on the Date of Loss.

19.     Plaintiff notified Defendant of the Loss on the Date of Loss.

20.     Defendants assigned the Loss Claim Number 300-0074707-2021 on or about the Date of Loss.

21.     Plaintiff notified Risk Management Partners of the Loss on or about the Date of Loss.

22.     Plaintiff took reasonable steps to immediately address and mitigate the loss on or about the Date of Loss.  Such steps included contacting a plumber and contacting a water damage mitigation company on the Date of Loss.

23.     The plumber immediately turned the water to the Residence off.

24.     The water to the Residence could not be turned back on without causing more damage to the Residence until the broken pipes were repaired.

25.     Defendant did not approve any expenses or provide confirmation of insurance coverage for any mitigation or repair efforts prior to February 18, 2021 or thereafter.

26.     Having no approval from Defendant for coverage of mitigation expenses, on or about February 18, 2021, Plaintiff rented a truck and a storage shed and began the process of moving or disposing of her damaged personal property from the Residence on her own.

27.     From on or around February 19, 2021 through March 22, 2021, Plaintiff personally packed and removed her damaged personal property from the Residence to either be stored in a rented storage shed or disposed.

28.     Plaintiff's personal mitigation efforts required her to miss work for four weeks while she attended to the water loss.

29.      Defendant did not send an adjuster to the Residence to investigate the Loss until March 19, 2021, over a month after the Loss occurred.

30.     On March 19, 2021, Defendant sent Carey Gilchrist from Ascent Claim Services as its agent to inspect and appraise the damage and cause of the Loss.

31.     On March 19, 2021, Defendant's agent, Mr. Gilchrist, confirmed that the thermostat was on and set to 66 degrees Fahrenheit.

32.     As Mr. Gilchrist was completing his inspection on March 19, 2021, a technician from Xcel Energy inspected the forced air furnace at the Residence.

33.     The Xcel technician discovered that the ignitor switch to the air furnace was broken and replaced the same.

34.     Mr. Gilchrist was informed of the broken ignitor switch and its replacement.

35.     Mr. Gilchrist prepared an estimate (the "**Ascent Estimate**") following his inspection.

36.     The Ascent Estimate did not account for repair or remediation of all damage caused by the Loss.

37.     The Ascent Estimate did not opine, comment, or reach any conclusion regarding vacancy or occupancy of the Residence prior to or on the Date of Loss.

38.     On or around March 30, 2021, Defendant requested and obtained a recorded statement (the "**Recorded Statement**") from Plaintiff.

39.     Defendant did not inquire as to Plaintiff's occupation of the Residence at or near the Date of Loss during the Recorded Statement.

40.     Defendant did not inquire as to whether the Residence was vacant at or near the Date of Loss during the Recorded Statement.

41.     Defendant did not inquire whether the Residence was under construction at or near the Date of Loss during the Recorded Statement.

42.     During the Recorded Statement, when Plaintiff challenged Ms. Hanner on the lacking communication throughout the claims process, explaining the numerous unanswered calls and requests for help over the preceding six-weeks, Ms. Hanner responded, stating "I'm calling you back right now and I don't work on the weekends so I apologize for that but I'm not going to call you on a Saturday or Sunday."

43.     Defendant did not have any adjuster assigned to the Loss to address concerns arising on the weekend or outside of Ms. Hanner's normal working hours.

44.     Plaintiff informed Defendant that she occupied the Residence as her primary residence on, before, and after the Date of Loss.

45.     Plaintiff informed Defendant that the Residence was not vacant on, before, or after the Date of Loss.

46.     Plaintiff never informed Defendant that the Residence was vacant, unoccupied, or under construction on, before, or after the Date of Loss.

47.     Plaintiff has continuously occupied the Residence since its purchase by Plaintiff in or around March 5, 1996.

48.     The Residence has not been vacant since its purchase by Plaintiff in or around March 5, 1996.

49.     Plaintiff has utilized the Residence as her private residence since its purchase in or around March 5, 1996.

50.     On April 1, 2021, Plaintiff secured the services of American Water Damage to inspect the Residence and prepare estimates for water damage mitigation and repair.

51.    Up to and including April 1, 2021, when Plaintiff asked Defendant, through her assigned claim adjuster Jamie Hanner, whether she should incur remediation and repair expenses, Ms. Hanner replied that she "would not do that if [she] were [Plaintiff]" because coverage was not yet confirmed.

52.    On or about April 1, 2021, Defendant, through Ms. Hanner, instructed Plaintiff to obtain a plumber to fix the leaks and turn the water on.

53.    When Mary responded, naively thinking that the claim was covered, Ms. Hanner explained that there was no coverage determination but that the plumbers were needed to determine "if pipes broke due to were wear and tear or if they were truly frozen."

54.    Plaintiff complied with Ms. Hanner's instructions and, on April 3 and April 4, 2021, a plumber repaired the ruptured pipes.  To do this, the plumber had to tear into walls and ceilings, and had to pull out bathroom tubs, sinks, and cabinets, causing further damage to the Residence.

55.    The Loss resulted from freezing plumbing resulting in ruptured pipes.

56.    Water supply to the Residence did not resume until April 4, 2021, following repairs to the ruptured pipes.

57.    Defendant did not authorize payment for repair of the pipes.

58.    On April 8, 2021, nearly two-months after the loss, Rimkus Consulting Group, Inc., acting as Defendant's agent, performed a second inspection of the Residence and subsequently prepared a report (the "**Rimkus Report**").

59.    The stated Rimkus purpose of the Rimkus Report was to "inspect the Building and to determine whether the heating systems were being used at the Building, and if possible, the thermostat setting."

60.    The Rimkus Report concluded that (1) Gas and electrical utilities were on and connected to the Residence from July 30, 2020 through March 3, 2021; (2) Heat was not being provided to the Residence for the months leading up to and including the freezing temperatures in February 2021; and (3) the natural gas consumption indicated that the thermostat and/or the furnace was turned to the off position throughout the winter of 2020-2021.

61.    The Rimkus Report further concluded that "Typical pipe ruptures occur after several days of freezing temperatures, followed by a warming trend. Thus, the water pipes froze on or about February 11 , 2021, and the pipes thawed sometime on or about February 16, 2021."

62.    The Rimkus Report did not investigate, opine, comment, or reach any conclusion regarding vacancy or occupancy of the Residence prior to or on the Date of Loss.

63.     The Rimkus Report did not investigate, opine, comment, or reach any conclusion regarding whether Plaintiff took precautions to maintain heat in the Residence.

64.     Plaintiff informed Defendant that she took precautions to maintain heat in the Residence, including maintaining the thermostat between 50 and 60 degrees Fahrenheit.

65.     Plaintiff never set her heat lower than 58 degrees Fahrenheit.

66.     On May 5, 2021, Plaintiff requested all relevant documents related to the loss, leaving a message with Jaime Hanner. She did not receive a return call on her request. She subsequently followed up with her supervisor, Chris Hoag, who referred her back to Jamie again with no response.  Defendant did not provide all of the requested documents until in or around March 24, 2022, following demand from counsel.

67.     On May 18, 2021, over three months after the Loss, Defendant informed Plaintiff that her claim was denied via voicemail.

68.     On May 18, 2021, Defendant mailed a denial letter to the Residence (the "**Denial Letter**").

69.     Defendant did not notify Plaintiff of any concerns regarding the Residence's occupancy or vacancy prior to the denial of her claim.

70.     The only reason Defendant provided for its denial in the Denial Letter was that "heat was not maintained in the" Residence, stating as follows:

> The determination that there is no coverage for your claim is based on our investigation, the policy identified and information provided. On April 8th the engineer confirmed heat was not maintained in the home which allowed pipes to freeze. Based on the policy language above, in order for there to be coverage heat needs to be maintained in the home. If there is any additional information you believe to be relevant to the question(s) of coverage, please advise and forward any additional information for review.

71.     The Denial Letter did not state that the Residence was vacant, unoccupied, or under construction.

72.     Defendant likewise represented falsely in the Denial Letter that, "in order for there to be coverage heat needs to be maintained in the home."

73.     In the Denial Letter, Defendant represented that the Exclusion 3(a)(5) served to exclude coverage for the Loss.

74.     In the Denial Letter, Defendant purported to quote Exclusion 3(a)(5), representing it as follows:

**2. PERILS WE INSURE AGAINST**

a. **Coverage A - Dwelling and Coverage B - Other Structures**

**We** cover risk of accidental direct physical loss to covered property described under Coverage A - Dwelling and Coverage B - Other Structures except for losses excluded elsewhere in this policy.

b. **Coverage A - Dwelling and Coverage B - Other Structures**

**We** do not cover loss to covered property caused directly or indirectly by any of the following, whether or not any other cause or event contributes concurrently or in any sequence to the loss:

**(5)** Freezing of plumbing, heating, air conditioning or automatic fire protection sprinkler systems or domestic appliances, or by discharge, leakage or overflow from the system or appliance caused by freezing while the building is vacant, unoccupied or in the course of construction unless, prior to the loss, you have either:

> **(a)** shut off the water supply and drained the systems and appliances; or
>
> **(b)** maintained heat in the building.

75. The Policy contained an Amendatory Endorsement to Exclusion 3(a)(5).

76. Specifically, Exclusion 3(a)(5), as quoted in the Denial Letter, was deleted, replaced, and materially modified by Amendatory Endorsement 57595 (2-14) – Freezing Exclusion (Homeowners Policy Forms 3, 4, and 6), as follows:

(5) Freezing of plumbing, heating, air conditioning or automatic fire protection sprinkler systems or domestic appliances, or by discharge, leakage or overflow from the system or appliance caused by freezing while the building is vacant, unoccupied or in the course of construction unless you **take precautions to**:

> **a.** shut off the water supply and drain the systems and appliances; or
> **b.** maintain heat in the building.

(amendments to exclusion in bold underline).

77. The plain and ordinary reading of Exclusion 3(a)(5), both as misquoted by Defendant and in the Amendatory Endorsement, requires that in order for a loss resulting from frozen pipes to be excluded, the loss must occur "while the building is vacant, unoccupied, or in the course of construction" **and** "heat has not been maintained in the building."

78.     Upon information and belief, all Colorado policies issued by the Defendant in Colorado providing homeowners coverage in or around 2020-2022 on Homeowner's Policy Form 3 included Amendatory Endorsement 57595 (02-14).

79.     Upon information and belief, Defendant includes Amendatory Endorsement 57595 (02-14) because, in part, the exclusion it amends is otherwise illusory.

80.     Upon information and belief, Defendant includes Amendatory Endorsement 57595 (02-14) due to requirements of the Colorado Department of Insurance.

81.     The Policy does not define the terms "vacant" or "unoccupied" as used in Exclusion 3(a)(5) or as amended by Amendatory Endorsement 57595 (02-14).

82.     Exclusion 3(a)(5) does not exclude losses occurring through freezing of plumbing even if heat is not maintained so long as the Residence is occupied, not vacant, and not under construction.

83.     The Denial Letter makes no mention of whether or not Defendant deemed the house at the time of the water rupture to be "vacant, unoccupied or in the course of construction."

84.     The Denial Letter makes no mention of any lacking precaution to maintain heat in the home or some intentional failure to maintain heat by Plaintiff.

85.     Plaintiff was not provided any additional reasons for Auto Owner's denial of her claim.

86.     Defendant cancelled or otherwise refused to renew Plaintiff's Policy on August 26, 2021.

87.     As a result of Defendant's cancellation or nonrenewal of her Policy, Plaintiff was forced to locate alternate coverage.

88.     Due to Defendant's refusal to provide coverage for the Loss and the resulting state of the Residence, the Residence was not insurable through generally available insurance coverage.

89.     Due to Defendant's refusal to provide coverage for the Loss and the resulting state of the Residence, Plaintiff's insurance expense increased while her coverage decreased.

90.     Defendant based its determination that no heat was maintained in the Residence upon Rimkus' review of Plaintiff's utility bills between January 2018 to April 2021.

91.     Rimkus' conclusion that Plaintiff was not maintaining heat in the Residence and that her thermostat and/or furnace "was turned to off" was based on solely on evidence of low gas usage during the months leading up to the water rupture.

92.     Plaintiff's gas usage in the months immediately preceding the water rupture were consistent with her usage for a three-year period preceding the rupture – including the prior winter.

93.     Plaintiff's gas records therefore establish she took precautions to maintain heat in her occupied home.

94.     Defendant was in possession of Plaintiff's gas records for three-years prior to the Loss.

95.     Defendant deliberately ignored this data because it was favorable to Plaintiff and unfavorable to its own interests.

96.     Plaintiff informed Rimkus, as Defendant's agent, that Xcel had replaced a failed ignitor.

97.     Despite being informed of the same, the Rimkus Report did not consider whether a failed ignitor was an alternate reasonable explanation for decreased utility usage despite the inspector's specific notation that "The furnace had an electric ignition system, so unless the burner was operating, the furnace did not use gas."   Thus, even assuming the heater was not on at the time of the water rupture, the failed igniter was at least an equally probable cause of lacking heat to the Residence.

98.     Defendant willfully ignored these alternate and more viable explanations in order to deny coverage unreasonably and upon bases unsupported by the Policy.

99.     Plaintiff provided, and Defendant was in possession of, Plaintiff's electricity usage from January 2018 through March 2021.

100.     Plaintiff's electricity usage during that time was as follows:



101.     This electricity usage is consistent with Plaintiff's continuous occupation of the Home, with consistent usage over the years.

102.    Consistent electrical use for three-years strongly evidences that the Home was occupied and not vacant.

103.    Defendant deliberately ignored Plaintiff's electricity usage in the prior three years as evidence of her occupancy of the Residence because it was adverse to its own interests and in favor of Plaintiff's.

104.    The Residence was fully furnished on the Date of Loss.

105.    On May 11, 2022, Defendant received photographs of the Residence that were taken on or around February 22, 2021, shortly after the Date of Loss, from Deep Water.

106.    The photographs of the Residence shortly after the Date of Loss in Defendant's possession showed the Residence was furnished, including personal effects, clothing, refuse, food items in the kitchen, and all expected items of residency.

107.    Defendant did not collect witness statements from or query third parties regarding Plaintiff's occupancy of the Residence or its vacancy.

108.    Defendant did not ask Plaintiff if any third parties other than her gas and electric utility provider might have information relevant to her occupancy of the Residence or its vacancy.

109.    Defendant did not investigate or otherwise inquire whether Plaintiff had any other properties or interests in properties at which she would otherwise reside.

110.    Defendant did not request documentation tending to establish Plaintiff's residence, such as tax returns, government issued ID, other utility bills, copies of mail addressed to her at the Residence, reviewing her vehicle registration, or other basic investigatory tasks to determine occupancy or vacancy of the Residence.

111.    Defendant never communicated to Plaintiff that her occupancy or vacancy of the Residence was a relevant consideration, thereby denying her the opportunity to present documentation or evidence of the same.

112.    The Policy included "Coverage D," providing coverage as follows:

**Coverage D - Additional Living Expense And
Loss Of Rents**

If a covered loss makes **your residence premises** unfit to live in, **we** will pay, at **your** option, either:

(1) the reasonable increase in **your** living expenses necessary to maintain **your** normal standard of living while **you** live elsewhere; or

(2) the fair rental value of that part of the **residence premises** where **you** reside, less any charges and expenses which do not continue while the **residence premises** is unfit to live in.

**We** will pay for only the shortest time required to repair or replace the **residence premises** or for **you** to permanently relocate. **We** will also pay for your loss of normal rents resulting from a covered loss while the rented part of the **residence premises** is unfit to live in, less charges and expenses which do not continue during that time. **We** will pay this loss of normal rents only for the shortest time needed to make the rented part fit to live in.

. . .

These periods of time will not be shortened by the expiration of this policy.

113.    Defendant's never informed Plaintiff of benefits available under Coverage D.

114.    Plaintiff presented a second demand for coverage on or about January 26, 2023.

115.    Defendant did not review the totality of enclosures to her second demand for coverage until February 15, 2023.

116.    Defendant lacks sufficient staff, employs, or agents to meet its duties to promptly conduct a reasonable investigation of its insureds' losses.

117.    Defendant deliberately lacks sufficient staff, employs, or agents to meet its duties to promptly conduct a reasonable investigation of its insureds' losses.

118.    Defendant failed to substantively respond to Plaintiff's second demand for benefits prior to the expiration of the Statute of Limitations.

119.    Defendant refused to cooperate with any tolling of the Statute of Limitations.

120.    Defendant refused to agree, or even discuss, the date upon which the statute of limitations began to run.

121.    Defendant's failure to respond prior to the expiration of the Statute of Limitations and refusal to cooperate in an extension of the same required the filing of this lawsuit to obtain the benefits sought.

122.    Defendant's failure to respond prior to the expiration of the Statute of Limitations and refusal, cooperate in an extension of the same, or agree upon when such limitations date began to run increased Plaintiff's attorneys fees, and therefore damages.

123.    Defendant was aware that its failure to respond prior to the expiration of the Statute of Limitations cooperate in an extension of the same, or agree upon when such limitations date

began to run would require the filing of a lawsuit and increase her attorneys' fees, and therefore damages.

124.    Defendant's failure to respond prior to expiration of the Statute of Limitations, cooperate in an extension of the same, or agree upon when such limitations date began to run was unreasonable under the circumstances and fell below the standard of care for insurers.

125.    Plaintiff cooperated in all material respects with Defendant in adjustment of the Loss.

126.    All documents identified herein are incorporated by this reference.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract – First-Party Insurance Benefits)**

127.    Plaintiff incorporates all paragraphs of this Complaint as if set forth fully herein.

128.    Defendant entered into a contract of insurance with Plaintiff to provide benefits for identified causes of loss to the Residence.

129.    Plaintiff was an insured under the Policy and is entitled to benefits from Defendant with respect to the Loss.

130.    The Loss was a covered loss under the Policy.

131.    The Loss was not excluded under the Policy.

132.    Plaintiff made a timely and proper demand for benefits under the Policy for the Loss.

133.     Defendant is legally and contractual obligated under the Policy to pay benefits to Plaintiff for the Loss.

134.    Defendant refused to pay benefits for the Loss.

135.    Plaintiff's benefits for the Loss are lawfully past due and owing to Plaintiff.

136.    Defendant's conduct and its failure to pay Plaintiff benefits owed under the Policy is a breach of Defendant's insurance contract with Plaintiff.

137.    Defendant's breach has caused economic and noneconomic damages and losses to Plaintiff in an amount and nature to be determined at trial.

138.    As a direct result of Defendant's breaches of its duties to its insured, Plaintiff has suffered damages and losses.

## SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Insurance Contract)

139.    Plaintiff incorporates all paragraphs of this Complaint as if set forth fully herein.

140.    By the actions described above, Defendant breached the Policy and has engaged in a course of conduct to deprive Plaintiff of the contractual benefits to which she is entitled.

141.    Defendant's conduct as set forth above falls below the standard of care of a reasonably prudent insurer doing business in the State of Colorado and violates the Policy's implied covenant of good faith and fair dealing.

142.    Defendant's unreasonable conduct in relation to Plaintiff's claims as set forth above was committed with knowledge of the fact that its actions were unreasonable or in disregard of the fact that its actions were unreasonable.

143.    Defendant breached its duty of good faith and fair dealing by its actions described above.

144.    Defendant's bad faith breach of the Policy proximately caused Plaintiff to suffer economic and non-economic harm, losses, and damages in amounts to be proven at trial.

145.    As a direct result of Defendant's breaches of its duties to its insured, Plaintiff has suffered damages and losses.

## THIRD CLAIM FOR RELIEF
### (Violation of C.R.S. §§ 10-3-1115, 1116, and 1104)

146.    At the time of the Loss, Plaintiff was an insured under the Policy.

147.    Plaintiff is a first-party claimant under C.R.S. § 10-3-1115.

148.    Defendant has unreasonably, recklessly, and/or willfully delayed or denied payment of benefits to which Plaintiff is entitled as a first party claimant by:

   a.   Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

   b.   Failing to acknowledge and act reasonably promptly upon communications with respect to Plaintiff's claims under the Policy;

c. Upon information and belief, failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under insurance policies;

d. Refusing to pay the claims without conducting a reasonable investigation based upon all available information;

e. Failing to affirm or deny coverage of claims within a reasonable time after submission or presentation of the same;

f. Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

g. Compelling Plaintiff to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such Plaintiff; and

h. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of her claim.

149. More specifically, Defendant's bad faith conduct includes, but is not limited to:

a. Knowingly or recklessly misrepresenting Exclusion 3(a)(5);

b. Unreasonable delays in communicating with Plaintiff;

c. Failing to respond at all to some communications from Plaintiff;

d. Unreasonable three-month delay in evaluating and coming to a coverage decision;

e. Failing to meet industry standards related to investigation of similar claims;

f. Failing, upon information and belief, to meet its own internal standard regarding investigation and determination of similar claims;

g. Failing to meet industry standards regarding availability of adjusters outside regular business hours;

h. Failing to collect all evidence necessary to make a fair evaluation of the claim and Plaintiff's damages;

i. Placing the onus on Plaintiff to adjust her own claim by failing to proactively seek out the information required for a fair evaluation and obligating her to obtain a plumber to determine the cause of Loss;

j.  Instructing Plaintiff to not incur remediation or repair expenses due to lacking coverage;

k.  Apparently questioning Plaintiff's credibility, without informing her of any concern, and without requesting corroborating evidence to address any concerns or otherwise providing her opportunity to substantiate the occupancy and non-vacancy of the Residence;

l.  Failing to disclose the availability of additional living expense benefits pursuant to Coverage D;

m.  Placing Defendant's interests in paying as little as possible on the claims ahead of Plaintiff's interests in receiving full compensation for her damages and losses;

n.  Failing to inform Plaintiff of the specific reasons coverage was denied;

o.  Failing to provide Plaintiff notice of any concern regarding occupancy or vacancy of the Residence;

p.  Failing to reasonably investigate the claim;

q.  Failing to use tools of the trade in its investigation of the claim or otherwise gather facts (witness statements, proper and complete analysis of Xcel records, proper investigation of home occupancy, inquiring of neighbors or other potential witnesses regarding the Residence's occupancy, inquiring of Plaintiff's familial relations as to where Mary slept each night, *etc*...);

r.  Failing to promptly and effectively communicate with anyone it was reasonably aware had information pertaining to the handling of a Plaintiff's claim;

s.  Failing to meet its duty to diligently search for evidence which supported Plaintiff's claim and not merely seek evidence upholding its own interests;

t.  Failing to evaluate coverage based on all information before it at the time of the denial;

u.  Forcing Plaintiff to go through needless adversarial hoops to achieve her rights under the Policy;

v.  Grossly and recklessly undervaluing the damage to the Residence;

w.  Conducting what amounted to an incomplete, inadequate, and one-sided/biased investigation in which the insurer looked for and gave greater weight to evidence it claimed supported exclusion of coverage than it gave to evidence supporting coverage;

x.  Forcing Plaintiff to file suit in order to obtain benefits under the policies to which she is clearly entitled;

y.  Failing to promptly review and consider documents submitted with Plaintiff's second demand for coverage;

z.  Unreasonably refusing to extend the statute of limitations to enable additional discussion without the need for initiating this lawsuit; and

aa. Unreasonably refusing to discuss or agree upon when the statute of limitations began to run to enable additional discussion without the need for initiating this lawsuit.

150.   Plaintiff engages in such unreasonable conduct with such frequency as to indicate a tendency to engage in a general business practice of unreasonably, recklessly, and/or willfully delaying or denying payment of benefits to its policy holders, including Plaintiff.

151.   Based on Defendant's above actions and/or violations, Plaintiff is entitled to bring an action and this claim against Defendant to recover two times the covered UIM benefits and reasonable attorney's fees and costs.

WHEREFORE, Plaintiff respectfully requests an Order granting Judgment against Defendant and in his favor for benefits in an amount to be determined in this proceeding; penalties of two (2) times such benefits for which payment was unreasonably delayed and/or denied; her reasonable attorney fees and court costs together with interest from the date of injury through to satisfaction of any judgment or award.

Plaintiff seeks to recover fees and costs, including costs for filing, witness fees, mileage, expert witnesses, exhibits and all other costs that are otherwise recoverable under law.

Plaintiff seeks all other economic, non-economic damages, and compensation recoverable under the law pursuant to any relevant theory of liability or recovery and as justice requires.

## JURY DEMAND

Plaintiff demands a trial by jury, the fee for which is tendered herewith.

Respectfully submitted February 16, 2023.

*/S/ Todd Scardina*
Todd Scardina, Esq., #40333
Autumn Scardina, #39491
*Counsel for Plaintiff*
*Duly signed original on file at the law offices of Scardina Law*

**<u>Plaintiff's Address</u>**: 8419 West 95th Drive in Westminster, Colorado 80021